**SIGNED this 14th day of August, 2018**



_____
Marcia Phillips Parsons
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>MICHAEL SCOTT CARMICHEL<br><br>-and-<br><br>GUARDIAN ENTERPRISES OF ALABAMA, LLC,<br><br>        Debtors. | No. 18-50024 MPP<br>Chapter 11<br>Jointly Administered |
| CYNTHIA ELLSWORTH and<br>EMS UNIVERSAL ID, LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>MICHAEL SCOTT CARMICHAEL,<br><br>    Defendant. | Adv. Pro. No. 18-5010 MPP |

# **M E M O R A N D U M**

Appearances:

| | |
|---|---|
| Maurice K. Guinn, Esq. | Ryan E. Jarrard, Esq. |
| Gentry, Tipton & McLemore, P.C. | Quist, Fitzpatrick & Jarrard, PLLC |
| Post Office Box 1990 | 800 South Gay Street, Suite 2121 |
| Knoxville, Tennessee 37901 | Knoxville, Tennessee 37929 |
| *Attorney for Plaintiffs* | *Attorney for Defendant* |

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge**. In this adversary proceeding, the plaintiffs Cynthia Ellsworth and her company EMS Universal ID, LLC ("EMS-LLC") seek a judgment and a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A), (4), and (6) against the debtor and defendant Michael Scott Carmichael. Presently before the court is Mr. Carmichael's motion to dismiss. He contends that the complaint which describes a failed romantic and business relationship between him and Ms. Ellsworth that resulted in a settlement agreement, now breached, is insufficient to state a claim for relief. Mr. Carmichael also seeks to strike certain portions of the complaint which he maintains serve no purpose other than to embarrass him. For the reasons discussed below, the court will grant the motion to dismiss as to the § 523(a)(4) count of the complaint but deny the motion as to the § 523(a)(2)(A) and (6) counts and deny the motion to strike. This is a core proceeding. *See* 28 U.S.C. § 157(b)(I).

I.

Under Federal Rule of Civil Procedure 12(b)(6), applicable in bankruptcy adversary proceedings through Federal Rule of Bankruptcy Procedure 7012(b), an action may be dismissed for failure to state a claim on which relief can be granted.

> The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions or legal conclusions. All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. The court need not, however, accept unwarranted factual inferences. To survive a motion to dismiss, the complaint must present enough facts to state a claim to relief that is plausible on its face.

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434

(6th Cir. 2008) (internal citations and quotation marks omitted).

"A claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

II.

The facts as alleged in the complaint are as follows. In November 2008 Ms. Ellsworth and Mr. Carmichael began working together at a telecommunications company when he joined her sales team. Their working relationship soon evolved into a romantic one. By August 2009 Mr. Carmichael was purchasing engagement and wedding rings for Ms. Ellsworth and she was divorcing her husband of 23 years with whom she had six children. While the divorce was pending, Ms. Ellsworth and Mr. Carmichael agreed to start and become partners in a "credit card processing–merchant services business." To this end, Mr. Carmichael formed EMS Universal Systems, Inc. ("EMS-INC"), a Tennessee corporation that entered into an "Agent Processing Agreement" with Electronic Merchant Systems ("EMS") on April 28, 2010. The next day Mr. Carmichael presented the agreement to Ms. Ellsworth as her birthday gift, "the promise of a new life together" and represented to others that they were "getting married and building a business together."

Through Ms. Ellsworth's contacts and efforts, she secured more than 80% of the merchant accounts and revenues for EMS-INC, including the Kyani Sun account. Ms. Ellsworth formed a team to distribute the Kyani Sun products, generating extraordinary sales commissions for EMS-INC from monthly sales in the millions of dollars. The commissions earned by EMS-INC were deposited into accounts controlled by Mr. Carmichael, who told Ms. Ellsworth that he was handling the business for the both of them and that he needed to control the money to protect her and to ensure that her child support payments would not be reduced.

3

In August 2011 the couple bought a house together in Idaho. In 2011 and 2012 Ms. Ellsworth participated in a BNI networking group that brought on sixteen merchant accounts for EMS-INC and also secured merchant accounts for the business through the Local Impact Zone in Boise, Idaho. Ms. Ellsworth did not enter into her own Agent Processing Agreement with EMS because she and Mr. Carmichael had agreed to be partners in business and marriage, and he had told her that "she should not have her own agency with EMS because she could have it only through him and there was no need to do so."

In early 2012 Ms. Ellsworth told Mr. Carmichael that she wanted a financial divorce. Ms. Ellsworth had learned that Mr. Carmichael was involved with another woman and that he had been untruthful to her about many things; he had also been abusive and violent. Consequently, on March 31, 2012, Ms. Ellsworth through her company EMS-LLC entered into an Independent Contractor Agreement with Mr. Carmichael and EMS-INC, who agreed to make certain payments in consideration for past services provided by Ms. Ellsworth and in contemplation of future such services. As to the latter, Mr. Carmichael and EMS-INC agreed to pay EMS-LLC 90% of their gross monthly receipts from clients/merchants referred by Ms. Ellsworth after April 1, 2012, and 10% of their gross monthly receipts from clients/merchants not referred by Ms. Ellsworth. In consideration for Ms. Ellsworth's past services, Mr. Carmichael and EMS-INC agreed to pay for ten years:

- The mortgage, property taxes, and maintenance expenses for Ms. Ellsworth's Idaho residence or a monthly housing allowance of $2,000 in the event she moved;
- The monthly payment of $833.75 on a 2010 Chevy Suburban for Ms. Ellsworth's exclusive use and any maintenance on the vehicle;
- Automobile insurance on the 2010 Chevy Suburban and a 2001 Jaguar, currently $77.50 per month;
- The American Express charge account for all business expenses of EMS-LLC and any other agreed upon personal expenses of Ms. Ellsworth;
- Furniture payments of $225 per month for furnishings in the Idaho residence;
- Ms. Ellsworth's Verizon cell phone bill estimated at $100 per month; and
- Monthly health insurance premiums of approximately $183 per month for Ms. Ellsworth.

After execution of this agreement, Mr. Carmichael did make certain required payments and serviced the EMS accounts, but he did not pay EMS-LLC or Ms. Ellsworth the required percentage

4

of future receipts or otherwise give her access to EMS-INC's financial records so that she could determine the amount to which her company was entitled, as their agreement required. Nonetheless, Ms. Ellsworth continued to refer accounts to EMS-INC, and the parties continued their personal relationship. In August 2012 Ms. Ellsworth learned she could have a separate office with EMS other than through Mr. Carmichael despite him having told her that she could not.

Throughout 2012 Ms. Ellsworth and Mr. Carmichael spoke every day, and in early 2013 they resumed spending more time together. Ms. Ellsworth told Mr. Carmichael that she wanted the money she was supposed to be getting and via direct deposits from EMS so she would know she was receiving what she was entitled to receive. In May 2013 Mr. Carmichael opened a separate account in Boise, Idaho with Ms. Ellsworth as a signatory. He made deposits to the account, but she repeated her request that the deposits be made directly by EMS, which occurred a few months later. For 2013, Mr. Carmichael and EMS-INC received a Form 1099 evidencing Miscellaneous Income of $929,468.80, and EMS-INC reported on its Form 1120 corporate tax returns for 2012, 2013, and 2014 income of $325,027, $895,267, and $893,418 respectively.

In June 2013 Ms. Ellsworth and Mr. Carmichael vacationed in Charleston, South Carolina, where they looked at houses and discussed plans to be together. During the drive from South Carolina to Knoxville, Mr. Carmichael told Ms. Ellsworth that he had been thinking a lot about marriage and that "it has to happen." The couple then decided to move together to Mount Pleasant, South Carolina. Mr. Carmichael promised Ms. Ellsworth that their life in South Carolina would be much better than they had ever imagined and that he would take care of her and her children.

In October 2013 Ms. Ellsworth and Mr. Carmichael bought property at 2961 River Way in Mount Pleasant and moved there. They sold their Idaho residence shortly thereafter. In the summer of 2014 the couple sold the residence at 2961 River Way and purchased another one at 2809 Stay Sail Way in Mount Pleasant, where Ms. Ellsworth continues to reside. Mr. Carmichael lived or visited there until November 2016.

In April 2015 Ms. Ellsworth learned that Mr. Carmichael had been involved with another

5

woman in the summer of 2014.  During the Christmas 2015 holiday season, Ms. Ellsworth learned that Mr. Carmichael had been involved with yet another different woman.  In July 2016 Ms. Ellsworth and Mr. Carmichael spent three days at Hilton Head to discuss their options.  The end result was a Settlement, Release and Confidentiality Agreement dated September 9, 2016, between Ms. Ellsworth and her business EMS-LLC as the "RELEASORS" and Mr. Carmichael and his companies EMS-INC, Guardian Enterprises LLC, and Guardian Enterprises of Alabama, LLC as the "RELEASEES."  Mr. Carmichael held out marriage as an option to get Ms. Ellsworth to agree to a lower monthly payment in the Settlement Agreement than they had previously agreed upon.

The Settlement Agreement recites that the parties are entering the agreement "to avoid the expense, uncertainties, and risks of litigation between themselves and to fully, finally and forever compromise and settle all past, present and future claims between them," including the RELEASORS' claims against the RELEASEES "for breach of contract, breach of fiduciary duties, usurpation of corporate opportunities, and other legal and equitable claims."  In exchange for the blanket release granted to them in the Settlement Agreement, the RELEASEES agreed to:

- Pay $2.76 million to EMS-LLC in monthly payments of $10,000 beginning September 2016 and ending September 2039;
- Transfer to EMS-LLC the entire EMS book of business, with Mr. Carmichael to continue to service its clients and earned commissions credited toward the $2.76 million obligation;
- Relinquish any interest in the couple's South Carolina property but assume its current mortgage including insurance and property taxes until paid in full;
- Transfer ownership on the 2010 Suburban and 2004 Acura to Ms. Ellsworth and make the monthly payment on the 2010 Suburban until the loan is paid off; and
- Obtain and maintain an insurance policy on the life of Mr. Carmichael in the amount of $3.5 million with Ms. Ellsworth as sole beneficiary until all financial obligations under the Settlement Agreement are satisfied.

Mr. Carmichael made the monthly payments under the Settlement Agreement until June 2017 but did not perform the other terms of the settlement.  In July 2017 Ms. Ellsworth and EMS-LLC sued Mr. Carmichael and his related companies in the Court of Common Pleas in Charleston, South Carolina for breach of the Settlement Agreement.  A scheduled hearing on their motion for entry of default judgment was stayed by the January 5, 2018 chapter 11 bankruptcy filings of Mr. Carmichael and Guardian Enterprises of Alabama, LLC.

Ms. Ellsworth and EMS-LLC have filed five proofs of claim in Mr. Carmichael's bankruptcy case, all based on the breached Settlement Agreement. Two of the claims are liquidated: one in the amount of $2,686,121.85 for the balance owed under the Settlement Agreement plus attorney fees as provided by the terms of the agreement, and the other in the amount of $590,796.05 for the mortgage debt, insurance, and taxes to be assumed for Ms. Ellsworth's South Carolina residence. The remaining three claims are unliquidated and pertain to the failure to transfer the EMS book of business to EMS-LLC, Mr. Carmichael's agreement to service EMS clients for the benefit of EMS-LLC, and his failure to obtain a life insurance policy.

In this adversary proceeding timely commenced by Ms. Ellsworth and EMS-LLC, they seek a judgment against Mr. Carmichael for the amounts sought in their proofs of claim, along with a determination that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), and (6). In count one of the complaint based on § 523(a)(2)(A), Ms. Ellsworth and EMS-LLC allege that Mr. Carmichael obtained money, property and/or services from them through false pretenses, false representations, and actual fraud. More specifically, they allege that Mr. Carmichael persuaded Ms. Ellsworth to join and support him in a merchant card processing business by falsely representing to her and others that they were to be business partners and married, that he deceived her by providing incorrect information for the Kyani billing volume and by not providing current financial information for EMS-INC when they negotiated the Independent Contractor Agreement in March 2013, and that Ms. Ellsworth would not have worked to support Mr. Carmichael's and EMS-INC's business efforts but for these false representations regarding marriage and business partnership.

Regarding the second count of the complaint premised on § 523(a)(4), Ms. Ellsworth and EMS-LLC contend that they hold claims against Mr. Carmichael for defalcation while acting in a fiduciary capacity and for embezzlement. They allege that his failure to pay them the share of commissions he controlled and agreed to pay pursuant to the Independent Contractor Agreement was a defalcation while acting in a fiduciary capacity. Alternatively, they allege that Mr. Carmichael embezzled the share of commissions he controlled and agreed to pay to them.

The third count of the complaint is based on § 523(a)(6) of the Bankruptcy Code, which

7

excepts from discharge debts for willful and malicious injury to another or another's property. Ms. Ellsworth and EMS-LLC allege that Mr. Carmichael intentionally and without just excuse converted the share of the commissions that he agreed to pay under the Independent Contractor Agreement. They also allege that Mr. Carmichael intentionally inflicted emotional distress upon Ms. Ellsworth, and describes incidents where he allegedly threatened, manipulated, and physically assaulted her.

III.

In his motion to dismiss for failure to state a claim, Mr. Carmichael first observes that all of the damages claimed by Ms. Ellsworth and EMS-LLC are derived from his breach of the Settlement Agreement, and that they have alleged no damages from the torts of fraud, breach of fiduciary duty, embezzlement, conversion, or intentional infliction of emotional distress. Consequently, he argues, as a matter of law they have failed to state a claim for relief under 11 U.S.C. § 523(a)(2)(A), (4) or (6). Mr. Carmichael adds that the statute of limitations for pursuing these tort claims ran before the bankruptcy case was filed, such that Ms. Ellsworth and EMS-LLC are now barred from asserting claims based on these causes of action. Lastly, Mr. Carmichael asserts that even if Ms. Ellsworth and EMS-LLC are able to overcome these hurdles, the facts as alleged in the complaint fail to state a claim for relief under any of the Bankruptcy Code sections. Each of these arguments will be addressed in turn.

Turning first to the argument that the complaint must be dismissed because only breach of contract damages has been claimed, no lower authority than the Supreme Court of the United States disagrees. In *Archer v. Warner*, 538 U.S. 314 (2003), the Court held that a bankruptcy court could look behind a settlement agreement to find that the debt to be paid under the agreement was one for money obtained by fraud within the terms of § 523(a)(2)(A).

> The settlement agreement and promissory note here, coupled with the broad language of the release, completely addressed and released each and every underlying state law claim. That agreement left only one relevant debt: a debt for money promised in the settlement agreement itself. To recognize that fact, however, does not end our inquiry. We must decide whether that same debt can *also* amount to a debt for *money obtained by fraud,* within the terms of the nondischargeability statute. Given this Court's precedent, we believe that it can.

*Id*. at 318-19 (internal citation and quotation marks omitted). *Archer* was a logical successor to the Court's decision in *Brown v. Felsen*, 442 U.S. 127 (1979), which held that a bankruptcy court was not precluded from looking behind a state court consent judgment to determine if it was a debt for money obtained by fraud and therefore nondischargeable under 11 U.S.C. 523(a)(2), even though neither the judgment nor the stipulation on which it was based indicated it was for fraud. *Archer* quoted *Brown* for the proposition that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Archer*, 538 U.S. at 320-21 (quoting *Brown*, 442 U.S. at 138). The Court added in *Archer*: "If we substitute the word 'settlement' for the word 'judgment,' the Court's statement [in *Brown*] describes this case." *Archer*, 538 U.S. at 321. *See also Gorse v. Nader (In re Nader)*, Adv. No. 11-1754, 2012 WL 1614856, *5-6 (Bankr. D.N.J. May 9, 2012) (analyzing, per *Archer*, nondischargeability under § 523(a)(2)(A), (4) and (6) of a settlement agreement that resolved a defaulted construction agreement).

In this case, the Settlement Agreement does not contain any admission of liability as to any particular cause of action; nor does the Agreement tie the financial obligations imposed on Mr. Carmichael to certain claims held by Ms. Ellsworth and EMS-LLC. Rather, it is evident from the language of the Settlement Agreement that it was intended to be an agreed settlement and damages compromise for all claims held by Ms. Ellsworth and EMS-LLC, whatever their basis. As previously quoted, the Settlement Agreement states that Ms. Ellsworth and EMS-LLC "have or will assert claims for breach of contract, breach of fiduciary duties, usurpation of corporate opportunities, and *other legal and equitable claims* against RELEASEES." (Emphasis supplied.) The Settlement Agreement further states that the parties "desire to avoid the expense, uncertainties, and risks of litigation between themselves and to fully, finally and forever compromise and settle all past, present and future claims between them, including, but not limited to, all claims which were raised or could have been raised by RELEASORS against RELEASEES, whether known or unknown or hereafter discovered." Given the Supreme Court's clear directive in these circumstances, this court is not precluded from going behind the Settlement Agreement to determine whether all or any of the debt provided for by the Agreement is nondischargeable under any applicable section of the Bankruptcy Code. *See, e.g., Jones v. Hurtado (In re Hurtado)*, Adv.

No. 1101192, 2015 WL 2399665, *1 (Bankr. E.D. Ca. May 18, 2015) (finding a portion of the settlement debt nondischargeable under § 523(a)(2)(A), but not the portion claimed nondischargeable under § 523(a)(4)).

Similarly, the fact that the applicable statutes of limitations for tort claims based on fraud, defalcation, conversion, or intentional infliction of emotional distress may have run is irrelevant. Because all of the potential claims against Mr. Carmichael, including tort claims, were compromised under the Settlement Agreement—a contract—the only material statute of limitations is the one for bringing an action based on breach of contract. The distinction is illustrated in the following case where the court held that state and federal securities statutes of limitations were not applicable to the debt fixed by a settlement agreement that compromised the securities fraud claims.

> It is well-established that there are two distinct issues in a dischargeability proceeding. The first, the establishment of the debt itself, is governed by the applicable non-bankruptcy statute of limitations—if suit is not brought within the limitations period, the debt cannot be established. The second, the question of dischargeability, is a distinct issue governed solely by the limitations periods established by bankruptcy law. *In re Collazo*, 817 F.3d 1047, 1051–52 (7th Cir. 2016). Where the debt has already been established prepetition, the non-bankruptcy statute of limitations is immaterial in the dischargeability proceeding. *In re McKendry*, 40 F.3d 331, 337 (10th Cir. 1994).
>
> The Debtor concedes that the Iowa lawsuit was timely filed and that the settlement agreement created an obligation, a debt, for him to pay $1 million to the Plaintiffs, a debt that was valid and enforceable against him when he filed for bankruptcy relief on June 30, 2015. Under *Brown* and *Archer,* it must now be determined whether that debt may be excepted from discharge in this adversary proceeding, which the Plaintiffs were permitted to file "at any time." See Fed. R. Bankr. Pro. 4007(b). The statutes of limitations that applied to the Iowa state court complaint are inapplicable to the adversary complaint.

*Winkler v. Pierce (In re Pierce)*, 563 B.R. 698, 707 (C.D. Ill. 2017).

In the present case, there is no allegation by Mr. Carmichael that Ms. Ellsworth and EMS-LLC cannot obtain a judgment for the obligations imposed on him under the Settlement Agreement because the applicable statute of limitations to enforce that agreement has expired. In fact, their state court action seeking such a judgment against him was pending when his bankruptcy case was

10

filed. Moreover, Mr. Carmichael has not objected to the proofs of claim filed by Ms. Ellsworth and EMS-LLC that are based on the Settlement Agreement, and each "constitute prima facie evidence of the validity and amount of the claim" per Federal Rule of Bankruptcy Procedure 3001(f). Accordingly, Mr. Carmichael's statute of limitations argument fails.

The remaining question is whether the complaint, as to each basis of nondischargeability, states a claim for relief that is plausible on its face. The first, 11 U.S.C. § 523(a)(2)(A), excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." As explained by the Sixth Circuit:

> In order for a debt to be nondischargeable under this provision, the creditor must prove: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss.

*Rembert v. AT&T Univ. Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

Under Federal Rule of Civil Procedure 9(b), incorporated by Federal Rule of Bankruptcy Procedure 7009, "a party must state with particularity the circumstances constituting fraud . . . ." One requirement of this rule is that "the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud." *Power & Telephone Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006).

In their complaint, Ms. Ellsworth and EMS-LLC contend that Mr. Carmichael "persuaded [Ms.] Ellsworth to join and support him in a merchant card processing business through false pretenses, false representations, and fraud." They allege that beginning in March 2009 until fall 2016 Mr. Carmichael falsely represented to Ms. Ellsworth and to others including her mother that they would marry and be business partners. They further allege that during negotiations for the Independent Contractor Agreement in March 2012 Mr. Carmichael deceived Ms. Ellsworth and EMS-LLC by providing incorrect information about the Kyani billing volume and by not providing

11

the current financial information for EMS-INC. Ms. Ellsworth and EMS-LLC contend that from April 2010 until May 2017 they referred leads to Mr. Carmichael and promoted and marketed EMS merchant services, which they never would have done but for Mr. Carmichael's misrepresentations of marriage and business partnership, which never took place.

Mr. Carmichael makes four arguments why this count must be dismissed. First, he maintains that the allegations of the complaint do not demonstrate that his representations that they would be business partners were false. To the contrary, he submits that his actions in giving Ms. Ellsworth the Agent Processing Agreement with EMS for her birthday, her work and efforts in securing merchant accounts for EMS-INC, and the Independent Contractor Agreement all demonstrate that they were in fact business partners. Second, as to his alleged misrepresentation that he and Ms. Ellsworth would marry, Mr. Carmichael argues that the complaint is deficient because it does not state with specificity where the promises were made or that the alleged promises were made with an intent to deceive; he also argues that promises to marry are unenforceable under state law and therefore can never be considered a misrepresentation. Third, as to Mr. Carmichael's alleged failure to provide the financial information about EMS-INC, he contends that the complaint is deficient because it does not indicate that he had a duty to provide such information or that he obtained any money, property or services from Ms. Ellsworth and EMS-LLC because of his failure. Lastly, as to the allegation that he provided incorrect information for the Kyani billing volume, Mr. Carmichael observes that no document with false information which he purportedly provided is attached to the complaint or otherwise identified, and argues that the mere assertion of falsity without more is insufficient to meet the required pleading requirements.

Admittedly, the complaint has holes, if any single misrepresentation were to be the sole basis of a fraud claim. However, when all of the allegations are considered collectively, it is clear that there are sufficient factual allegations, pled with specificity, that state a plausible claim for fraud and false pretenses under § 523(a)(2)(A). The complaint adequately describes numerous representations by Mr. Carmichael to Ms. Ellsworth that they would be business partners and marry. While Mr. Carmichael may dispute that the business partner representations were false,

the complaint contains sufficient allegations to support the contention that the representations were in fact false and that the parties were not business partners, specifically the allegations that Mr. Carmichael formed, controlled and managed the credit card processing–merchant services business, that he controlled the accounts into which the commissions were deposited, and that he did not give her access to the business' financial records.   Since the filing of the motion to dismiss, Ms. Ellsworth has filed an affidavit authenticating the Independent Contractor Agreement and Settlement Agreement.   Paragraph 6 of the Independent Contractor Agreement entitled "Access to Records," unequivocally states that EMS-LLC "shall have unlimited and independent access at all times to any reports . . . which evidence merchant accounts managed by [Mr. Carmichael] and for which [Mr. Carmichael] receives any compensation."   As to the representations that they would marry, Ms. Ellsworth and EMS-LLC correctly point out that they are not seeking to enforce this promise, only to establish that Mr. Carmichael falsely promised marriage for years in order to obtain Ms. Ellsworth's efforts, contacts, and services on behalf of his business.   Other alleged representations that were part of the alleged fraudulent scheme were that Mr. Carmichael deceived Ms. Ellsworth during the contract negotiations into accepting a lower valuation on her services by not providing current financial information about EMS-INC and by furnishing incorrect information about the Kyani billing volume.   Undeniably, the complaint adequately alleges that she relied on Mr. Carmichael's false representations and would not have worked to support his and EMS-INC's business efforts but for his misrepresentations and that her reliance was the proximate cause of her loss.   Consequently, the claim for relief under § 523(a)(2)(A) will not be dismissed.

The second count of the complaint is based on 11 U.S.C. § 523(a)(4), which excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."   Ms. Ellsworth and EMS-LLC contend that Mr. Carmichael's obligation to them is nondischargeable because it arose out of a defalcation by a fiduciary or an embezzlement.   As to the former, the Sixth Circuit Court of Appeals has explained that in order to find a debt nondischargeable under § 523(a)(4) as a defalcation by a fiduciary, proof by a preponderance of the evidence must establish "(1) a pre-existing fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss."   *Bd. of Trustees of the Ohio Carpenters' Pension Fund v.*

13

*Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007). The fiduciary relationship required by this provision is narrower than in some contexts; an express or technical trust relationship is required. *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). Consequently, whether a fiduciary relationship has been created is determined by federal law, although courts look to state law in ascertaining whether an express or technical trust has been created. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390-91 (6th Cir. 2005). In South Carolina, the choice of law under the Settlement Agreement:

> [A] trust is established if there exists "a declaration creating the trust, a trust *res,* and designated beneficiaries." *Whetstone v. Whetstone,* 309 S.C. 227, 231, 420 S.E.2d 877, 879 (Ct. App. 1992). A trust arises where parties agree that one party will transfer property to another, so that the transferee can administer the property for the benefit of the transferor. *Lewis v. Payne (In re Payne),* No. 08–03647–JW, Adv. No. 08–80175–JW, at 5 (Bankr. D.S.C. Apr. 7, 2009) (quoting *State v. Jackson,* 338 S.C. 565, 570, 527 S.E.2d 367, 370 (Ct. App. 2000)). For a trust to be created there must be some agreement establishing a trust relationship or some other legal foundation establishing the trust.

*Drennan v. Hunnicutt (In re Hunnicutt)*, 466 B.R. 797, 801 (Bankr. D.S.C. 2011). *Accord Streibick v. Murrell (In re Murrell)*, Adv. No. 03-6354, 2004 WL 1895200, *4-8 (Bankr. D.S.C. Aug. 12, 2004) (discussing law in Idaho, which is choice of law under the Independent Contractor Agreement).

In the present case, there is no suggestion that an express or technical trust was established by agreement or by operation of law. Rather, it is only alleged in the complaint that Mr. Carmichael controlled and managed the credit card processing–merchant services business, that as "the manager" of this business he "acted as a fiduciary with respect to [Ms.] Ellsworth," and that his failure to pay to Ms. Ellsworth and EMS-LLC the share of commissions he controlled and agreed to pay pursuant to the March 31, 2012 Independent Contractor Agreement was "a defalcation while acting in a fiduciary capacity." However, mere allegations of wrongdoing by an alleged fiduciary is insufficient. "It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as trustee *ex maleficio.* He must have been a trustee before the wrong and without reference to the wrong." *Arrow Concrete Co. v. Bleam (In re Bleam)*, 356 B.R. 642, 649 (Bankr. D.S.C. 2006) (quoting *Davis v. Aetna*

14

*Acceptance Co.,* 293 U.S. 328, 333 (1934)).

Likewise, the alleged "'special relationship' created by [Mr. Carmichael's] relentless romantic pursuit of [Ms.] Ellsworth" and his representations "that he was handling the business for [Ms.] Ellsworth and taking care of her accounts" also fail to satisfy the narrow confines of § 523(a)(4). "The traditional meaning under state law—loyalty, good faith and fair dealing—is too broad for purposes of this section." *Allen v. Scott (In re Scott)*, 481 B.R. 119, 181 (Bankr. S.D. Ala. 2012). While a resulting or constructive trust may have arisen under state law based on the couple's relationship and Mr. Carmichael's actions, that is not sufficient to establish a fiduciary duty for purposes of § 523(a)(4).

As for embezzlement, the Sixth Circuit Court of Appeals defines the term for purposes of §523(a)(4) as:

> the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (internal citations omitted). Though evident from the Sixth Circuit's definition, "[t]o constitute embezzlement, the fraudulent appropriation must be 'of another's property.'" *Banco Popular, N.A. v. Rodriguez (In re Rodriguez)*, No. 06-3467, 2007 WL 543750, *5 (Bankr. S.D. Tex. Feb. 15, 2007); *see also Anzalone v. Dulgerian (In re Dulgerian)*, 388 B.R. 142, 151 (Bankr. E.D. Pa. 2008) ("One cannot embezzle one's own property.").

In the present case, the only allegation regarding an embezzlement in the complaint is that Mr. Carmichael embezzled the share of commissions that he and his business EMS-INC were obligated under the Independent Contractor Agreement to pay to Ms. Ellsworth and EMS-LLC. However, the agreement required Mr. Carmichael to pay certain percentages of "all of [Mr.] Carmichael's gross monthly receipts for every client/merchant after April 1, 2012 . . . ." Thus, the receipts belonged to Mr. Carmichael and his business; he was simply obligated by the agreement to pay a percentage of them to Ms. Ellsworth and EMS-LLC. "Where the parties' conduct indicates a

15

debtor/creditor relationship, funds that come into the hands of the debtor belong to him and any subsequent use of them is not embezzlement." *United Am. Ins. Co. v. Koelfgen (In re Koelfgen)*, 87 B.R. 993, 998 (Bankr. D. Minn. 1988) (independent contractor's wrongful retention of insurance premiums did not constitute embezzlement for purposes of § 523(a)(4)). Because the complaint fails to state a claim for defalcation while acting in a fiduciary capacity or embezzlement under § 523(a)(4), this count of the complaint must be dismissed.

The third count of the complaint is under 11 U.S.C. § 523(a)(6) which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." As stated by the Sixth Circuit, "the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). Regarding the willfulness requirement, the Supreme Court has stated that "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974 (1998). In turn, the Sixth Circuit Court of Appeals has interpreted *Geiger* to mean "that unless 'the actor desires to cause consequences of his act, or believes that the consequences are substantially certain to result from it,' . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464.

The second element of § 523(a)(6), that the injury be malicious in addition to willful, "means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). Stated differently, "[t]here must also be a consciousness of wrongdoing . . . . It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6)." *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (citations omitted). A party may establish malice for purposes of § 523(a)(6) by showing "that (1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010) (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991); *see also Petralia v. Jercich (In re*

16

*Jercich)*, 238 F.3d 1202 (9th Cir. 2001)).

The first allegation under this count is that Mr. Carmichael willfully and maliciously injured Ms. Ellsworth and EMS-LLC and their property by converting and misappropriating the commissions he was obligated to pay them under the Independent Contractor Agreement.

> Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion of defiance of the owner's rights." *Thompson v. Thompson,* 2009 WL 637289, at *14, 2009 Tenn App. LEXIS 99, at *45 (Tenn. App. Mar. 12, 2009); *see also Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn. App. 1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property). "The main focus of the tort is the interference with an owner's property right [and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion." *Gen. Elec. Credit Corp. v. Kelly & Dearing Aviation,* 765 S.W.2d 750, 753 (Tenn. App. 1988). "[W]hile they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)." *Superior Metal Prods. v. Martin (In re Martin),* 321 B.R. 437, 441 (Bankr. N.D. Ohio 2004). Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur. *Sweeney v. Lombardi (In re Lombardi),* 263 B.R. 848, 853 (Bankr. S.D. Ohio 2001).

*Walker v. Alama (In re Alama)*, 500 B.R. 887, 893 (Bankr. E.D. Tenn. 2013). There are sufficient factual allegations in the complaint to infer that Mr. Carmichael converted the commissions due under the Independent Contractor Agreement and intended the harm caused by the conversion or knew that the harm was substantially certain to occur, given his alleged refusal to give Ms. Ellsworth access to the financial records so that she could determine the amount of commissions due and given the history of the couple's personal relationship. Accordingly, the complaint sufficiently states a claim under § 523(a)(6) for a willful and malicious conversion.

The complaint's second basis for relief under § 523(a)(6) is that Mr. Carmichael willfully and maliciously injured Ms. Ellsworth through certain outrageous threats and acts of physical violence specifically alleged in the complaint which caused Ms. Ellsworth emotional distress. A debt arising from misconduct constituting intentional infliction of emotional distress satisfies §

17

523(a)(6)'s willful and malicious standard. *See Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 5 (6th Cir. 2004). And whether the elements of this tort are evaluated under the laws of Idaho, South Carolina or Tennessee, the specific allegations set forth a plausible claim of intentional infliction of emotional distress. *See Stanton v. Battelle Energy Alliance, LLC*, 83 Fed. Supp.3d 937, 947-48 (D. Idaho 2015) (stating that elements of tort under Idaho state law include "(1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and outrageous; (3) that there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) that the plaintiff's emotional distress was severe."); *Lynch v. Toys "R" US-Delaware, Inc.*, 654 S.E.2d 541, 550 (S.C. App. 2007) (noting that requirements under South Carolina law are "(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his or her conduct; (2) the conduct was so extreme and atrocious as to exceed all possible bounds of decency and must be regarded as outrageous and utterly intolerable in civilized society; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it."); *Strong v. HMA Fentress County Gen. Hosp., LLC*, 194 Fed. Supp.3d 685, 690 (M.D. Tenn. 2016) (observing that under Tennessee law the elements of intentional infliction of emotional distress claim are "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury.").

In fact, Mr. Carmichael does not deny in his motion to dismiss that the factual allegations of the complaint are sufficient to satisfy the state law components of a cause of action for intentional infliction of emotional distress. He argues, however, that there is no claim because no damages are alleged to have resulted from the alleged misconduct and that the only damages claimed by Ms. Ellsworth and EMS-LLC are for breach of the Settlement Agreement. As previously discussed, however, the Settlement Agreement establishes that Mr. Carmichael owes a debt to Ms. Ellsworth and EMS-LLC. The extent to which that debt results from the claim for intentional infliction of emotional distress will need to be established at trial. The count under § 523(a)(6) will not be dismissed.

Finally, Mr. Carmichael requests that paragraphs 48-51 of the third count of the complaint be stricken as scandalous pursuant to subdivision (f) of Federal Rule of Civil Procedure 12 because they "are made without any justification for the sole purpose of embarrassing" him. The court having determined that the intentional infliction of emotional distress claim has been adequately pled, the allegations are material and therefore will not be stricken.

## IV.

The court will enter an order in accordance with this memorandum opinion granting the motion to dismiss as to the § 523(a)(4) count of the complaint for failure to state a claim upon which relief may be granted and denying the motion as to the § 523(a)(2)(A) and (6) counts and denying the motion to strike.

# # #